NOE (PRENTICE v.). See Case No. 11,382.

## Case No. 10,285.

NOE v. UNITED STATES.

[Hoff. Land Cas. 162.] [1]

District Court, D. California. June Term, 1856.[2]

### LAND GRANT IN CALIFORNIA.

Entitled to confirmation under the ruling of the supreme court in Fremont's Case [17 How. (58 U. S.) 542.]

Claim for five leagues of land in Yolo county, rejected by the board, and appealed by the claimant [James Noé].

Calhoun Benham, for appellant.

William Blanding, U. S. Atty., for appellees.

HOFFMAN, District Judge. It appears by the title papers produced in this case, that on the tenth of May, 1841, Robert Elwell presented a petition to Governor Alvarado for a tract of land on the Sacramento river. The petitioner set forth that for sixteen years he had been a resident of the country, and had a numerous family. He also stated that the various political changes in the country had impaired his capital, part of which had been furnished to the different governors, as his excellency was aware. The petitioner further alludes to his services in the militia, for which he never received any pay, owing to the scarcity of funds in the national exchequer. He therefore begs that his excellency, not forgetting the duty of generously recompensing the services of faithful subordinates, and also "the necessity of giving an impulse to the progress of agriculture in the country," and supported as he was by the colonization laws which so fully authorized him to make concessions of land, might grant him the tract solicited. On the margin of this petition the governor writes: "In consideration of the services and merits herein mentioned, I grant him (the petitioner) the land he requests, with the understanding that he shall abide by the reports that must be asked for as to whether the land has been granted for the benefit of some private individual, pueblo or corporation, with all the rest that may be deemed convenient, so soon as he shall accompany the plan which will head the formation of the expediente." This petition and marginal decree appear to have remained in the possession of the petitioner, nor were any further steps taken by him to obtain a more formal title. He states, however, in his deposition, that a plan was furnished to the governor such as was deemed sufficient, but the expediente which it was to "head" is not produced from the archives. No efforts of any kind appear to have been made by the petitioner to settle upon or occupy his land, and the title papers seem to have remained in

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]
[2] [Reversed in 23 How. (64 U. S.) 312.]

his possession until 1852, when he sold to the present claimant. In explanation of his failure to occupy the land, the grantee states that he was prevented from doing so at the time of the grant by the danger from the Indians, and afterwards by the disturbances in the country. José Castro, a native Californian of some distinction, and who has held the offices of governor, prefect and commandant general of the territory, deposes that from 1841 until the change of government the whole region of country above Sutter's Fort, or New Helvetia, was not in a situation to be settled upon by individual grantees, owing to the hostility of the Indians. The government rarely sent any troops to maintain settlements, and only for short times and few in number, during the period from 1841 to the change of government. Nathan Coombs, whose deposition was taken in this court, and who has resided in the country since 1843, testifies that from that year, when he first knew the land, the Indians in the neighborhood were hostile to the whites. That near the head of the island there was a rancheria, and the Indians were very numerous. That a company from Oregon, of which he was a member, had a fight with a large body of them, from five hundred to one thousand strong, and that during the same season Captain Sutter with a party of men also had an engagement with them. The above comprises all the evidence offered in excuse or explanation of the omission of the grantee to fulfill the conditions of his grant.

The first question that arises under this state of facts is, did the marginal decree of the governor convey to the petitioner "a present and immediate interest, either legal or equitable, in the land?" The form of the grant is entirely unusual. The marginal decrees of the governors were in ordinary cases but references for information, and the expedientes usually contain the petition, the diseño, the marginal order of reference, the reports of the officers, and the order or decree of concession by the governor—the latter generally commencing with the words "Vista la peticion." The documento or final title was then made out in conformity with the order of concession. In this were expressed the conditions of the grant, its extent, etc., and it was delivered to the party interested as his title deed. A copy, however, was usually attached to the other documents above enumerated, forming the expediente on file in the archives; but the copy was frequently not signed, it being thought sufficient if the title paper delivered to the party was properly authenticated. The title paper was usually signed by the governor and secretary. The expediente, when thus completed, was transmitted to the assembly for their action, and if the grant was approved, a certificate of the fact was given to the grantee. I have met with no case where these forms were not substantially complied with when grants under the colonization laws were made. In the case at bar, the only document relied on as a grant is the order or decree written on the margin of the petition. Undoubtedly the governor uses words of grant—"I grant him the land which he requests"—but the condition or qualification annexed, that the petitioner should abide by the reports, etc., clearly shows that the governor did not intend his marginal decree to operate as a definitive concession of the land. In the case of Arguello v. U. S. [18 How. (59 U. S.) 539], decided at the last term of the supreme court, the court, in speaking of the order of concession in that case, (which was the decree already alluded to, beginning with the words—"Vista la peticion," and which was certainly a more formal decree than the marginal order in the present case) say: "By the fourth section, the governor, being thus informed, may 'accede or not' to the petition. This was done in two ways; sometimes he expressed his consent by merely writing the word concedido at the bottom of the expediente; at other times with more formality. * * * It is intended merely to show that the governor has acceded to the request of the applicant, and as an order for the patent or definitive title to be drawn out for execution. * * * It has none of the characteristics of a definitive grant." But the marginal decree in this case cannot even be regarded as an order for the definitive grant to be made out. For the governor clearly intimates that reports are to be received, the diseño to be furnished, and the expediente to be formed, before the final title issued. The marginal order must, I think, be taken merely as showing that the governor has acceded to the petitioner's request, and agrees to grant him the land if the reports, etc., should be favorable. But it is to be observed that the information required by the governor was only as to whether the land was the property of any one else, and the absolute terms of the order itself, as well as the language of the qualification added to it, perhaps justify us in considering it as a positive promise to grant the land to the petitioner in consideration of his just claims upon the government, provided it should turn out that the land was vacant. The right thus acquired by the petitioner was an equitable claim upon the government to have his title perfected, and had he gone on to occupy and improve his land, and had he been found at the acquisition of the country in the possession and enjoyment of it, the United States would have been clearly bound to respect his rights. But so far as the evidence discloses, the petitioner never went upon the land during the existence of the former government. The causes of his omission to do so, as shown by the evidence, were the usual ones of Indian hostilities and political disturbances. No testimony has been taken to show that the obstacles to a settlement might have been overcome; nor has it been made to appear to the court, on behalf

of the United States, that any one demanded the land. Compelled as we are to be governed by the evidence in each particular, we must accept facts as true which are established by the uncontradicted testimony of unimpeached witnesses. It would seem clear then, from the testimony, that from the time of the grant until the American occupation, the settlement of the land was impracticable. The omission to occupy cannot, therefore, raise any presumption of a voluntary abandonment by the grantee. That such a delay would not probably have forfeited the land under the Mexican laws and usages, unless some other person was ready to appropriate the lands and thus carry out the policy of the government, was intimated by the supreme court in the Case of Fremont. More especially would the grantee be entitled to indulgence where the grant was "not made merely to carry out the colonization laws, but in consideration of previous public services."

The circumstance which suggests most strongly the idea that the grantee. did in truth abandon all thought of profiting by his grant, is his omission to make further application for the usual and formal title. I have endeavored correctly to estimate the force which should be given to this consideration. It has seemed to me that it would perhaps be going too far to infer such an intention from the grantee's omission in this particular. As to his acts and declarations from the time of the grant until the conveyance to the present claimant, we are wholly uninformed. Whether he continued to assert his rights to the land, and whether those rights were recognized by the government, we are ignorant. And in the absence of proof we are perhaps justified in supposing that he considered his right to the land sufficiently secured by the title he had received, particularly as the causes which prevented a settlement by him would also deter others from applying for the land. But admitting that the explanation of the grantee's delay in this case is sufficient, within the rule laid down in Fremont's Case [17 How. (58 U. S.) 542], to repel the idea of a voluntary abandonment and consequent forfeiture, it is to be remembered that the grant in this case was not like that to Alvarado, a definitive or final title with conditions subsequent annexed. It was but an inchoate or imperfect grant, and as has been shown, cannot be regarded as a grant under the colonization laws passing final title to the land.

The inquiry in this case would therefore seem to be, not as in Fremont's Case [supra], whether the omission to perform conditions subsequent had forfeited an estate vested in the grantee by a formal and definitive grant, but whether he is in equity entitled to a completion and perfection of the inchoate title or equitable right he received from the former government. Under the Mexican colonization laws the strongest claim he could urge would be the fact that he had, by settling upon and improving the land, given the only consideration for the grant their laws or policy required. But in this case he can found his claim upon no such consideration; and though he may not be deemed to have voluntarily abandoned his grant, yet he can allege nothing done by him subsequent to it, or on the faith of it, which strengthens his equitable claim either upon this or the former government. If then this grant had been solely on consideration of future settlement and occupation, it seems to me that it should be rejected. But it appears that the petitioner had other claims, not merely on the bounty but on the justice of the Mexican government. In his petition he appeals to the governor's knowledge of the fact that he had impaired his capital by furnishing money to different governors, and that he had faithfully served in the militia without receiving pay, owing to the scarcity of funds in the national exchequer. He asks for the grant as a recompense for his services, as well as because it would be in accordance with the policy of the colonization laws. The governor, in acceding to the petition, expressly says that he does so "in consideration of the services and merits herein mentioned;" and by the testimony of Alvarado himself, taken in this court, it appears that the petitioner was actually a creditor to the government for advances made by him, as well as entitled to its consideration for his patriotic services. In the Case of Fremont the supreme court say: "Although this cannot be regarded as a money consideration, making the transaction a purchase from the government, yet it is the acknowledgment of a just and equitable claim; and when the grant was made on that consideration, the title in a court of equity ought to be as firm and valid as if it had been purchased with money on the same condition." But in that case the consideration alluded to was the patriotic services of the petitioner, and they are only referred to in the grant as entitling his application to a "preference" over other applications for favorable consideration. But in the case at bar the petitioner had not only faithfully served the country, but appears to have been a creditor for advances made by him and pay due to him as a soldier. The observations of the supreme court apply, therefore, with great force to the present case. If then the petitioner cannot be deemed to have voluntarily abandoned his grant, it has seemed to me that the equitable right he acquired, on the considerations mentioned, ought to be respected, although he has failed to furnish the other consideration of settlement and occupation, upon which in general Mexican grants were made. It can hardly be doubted that, as testified by Alvarado, the former government would have felt itself bound to perfect a title promised to him by the governor under such circumstances; and that the grant by the latter of the land, provided it was vacant, would, had the petitioner subsequently applied for the

formal title, have been treated as giving him a right to have it issued. That equitable obligation is as binding on the conscience of this as of the former government, and it has, after much consideration, appeared to me that the claim should be confirmed.

The counsel for the claimant has urgently pressed upon the court that the grant in this case was not made under the colonization law of 1824, and the regulations of 1828, but under the law of April 4, 1837. 1 Rockwell, 627. But this view cannot be supported. That law, even if it were ever carried into effect in California, merely authorizes "the government with the consent of the council," to give effect to the colonization of the lands of the republic, by means of sale or mortgage —"applying the amount to the redemption of the national debt," etc. This evidently confers the authority on the supreme government, and we accordingly find that a decree was made by the supreme government in virtue of the authority conferred by the law of the fourth of April, by which a national consolidated stock was created, and 100,000,-000 acres of land, in various departments, pledged to secure it. In case the land so pledged should be sold, it was provided that the sale should be at the rate, at least, of four acres to the pound; and the purchase money was to be paid by the purchaser to government agents in London, to be used by them for the redemption of the stock. It is evident that the grant in the case at bar was not a purchase under this law. The petition itself repels such an idea, for the petitioner refers to the colonization laws, and their intention and policy, as giving authority and furnishing a proper inducement to the grant. It is clear that this grant was a concession under the colonization laws—not a sale under the law of 1837. The land is described in the petition as situated in the "waste part of the Sacramento frontier, about eighteen leagues from the establishment of Don Aug. Sutter. This land is bounded by the Sacramento river like an island, and is indicated by a hill on the bank of the river, which there divides itself into arms east and west, and contains five square leagues, more or less, agreeably to the plan which I shall present as soon as circumstances shall permit me so to do." The governor granted the petitioner the land he requested. The diseño has not been produced, although the grantee testifies that it was furnished.

It nowhere appears from the evidence what quantity of land is embraced within the limits of the island mentioned by the petitioner. The grant could not, however, by law, have been for a greater quantity than eleven leagues. The tract is described in the petition as "bounded by the Sacramento river like an island," and the governor in his marginal decree grants "the land solicited." The subject of the grant would therefore seem to be the island mentioned; and we think the claim should be confirmed to the land included within its limits, provided that they do not embrace more than the quantity of eleven leagues. It is stated by counsel that the quantity of land included in the island is somewhat more than six leagues. The petitioner represents it as five leagues, more or less. This is perhaps as close an approximation to the real quantity as often occurred under the loose and inaccurate ideas of the extent of land formed by the former inhabitants of this country; and as the governor, we think, intended to give the island, and as no deception seems to have been practiced upon him, the claim should be sustained for the whole land which the petitioner intended to solicit, and the governor to grant.

[NOTE. There was an application on behalf of the United States for an appeal in this case. The case was subsequently heard upon objections to the application, which objections were overruled and the appeal granted. Case No. 10,286. Upon the appeal in the supreme court the decree of the district court was reversed, and order entered that upon the case being remanded the petition of the plaintiff be dismissed. 23 How. (64 U. S.) 312.]